IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ADVANTAGEOUS COMMUNITY
SERVICES, LLC, ARMINDER KAUR,
HARASPAL SINGH, and HARCHI SINGH,

     Plaintiffs,

v.                                          1:17-cv-00525-LF-KK

GARY KING, AMY LANDAU,
ELIZABETH STALEY, MARC
WORKMAN, CATHY STEVENSON,
ORLANDO SANCHEZ, and
WALTER RODAS,

     Defendants.

## **MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court on defendants Gary King, Amy Landau,

Elizabeth Staley, Mark Workman, Cathy Stevenson, Orlando Sanchez, and Walter Rodas'

(collectively "State Defendants") Motion for Summary Judgment (Doc. 95), filed April 12, 2019.

Plaintiffs filed their Response to Defendants' Motion (Doc. 98) on April 29, 2019.  State

Defendants filed their Reply in Support of Their Motion for Summary Judgment (Doc. 102) on

May 20, 2019.  The parties consented to my entering final judgment in this case.  Docs. 6−14.

Having read the submissions of the parties and being fully advised, and for the following

reasons, the Court GRANTS the State Defendants' Motion for Summary Judgment.

## I.    <u>Statement of Facts</u>[1]

The New Mexico Human Services Department ("HSD") is responsible for administering Medicaid and maintaining the managed care system for Medicaid recipients. UMF 8. The State Defendants assert, without any evidentiary support,[2] that the Medicaid Assistance Division ("MAD") is a division within HSD that is responsible for executing Provider Participation Agreements to ensure that Medicaid providers are qualified under the Medicaid Act. UMF 9. HSD works under an interagency agreement with the New Mexico Department of Health (DOH) to administer a portion of the Medicaid program. UMF 10. HSD had primary responsibility for accepting claims for services rendered, reviewing claims to ensure accuracy, then paying the claims. *Id.*

DOH provides program management and technical assistance to Medicaid programs, including enrolling providers and providing training to providers on how to provide services, as well as advising them of the rules and requirements of the Medicaid system. UMF 11. Plaintiff Advantageous Community Services, LLC, ("Advantageous") is a New Mexico business that provided home-based care to Medicaid recipients pursuant to the Developmental Disabilities Waiver Program. Doc. 1-1 ¶ 16; Doc. 77 ¶ 16. Defendant Cathy Stevenson was the Acting Director of the Developmental Disabilities Supports Division ("DDSD"). UMF 12. DDSD reported to DOH. *Id.* The Division of Health Improvement—another division under DOH—was

---

[1] For facts that Advantageous does not contest for the purposes of this motion, the Court cites to the Undisputed Material Fact ("UMF") in the State Defendants' Motion for Summary Judgment. Doc. 95 at 2−6. For facts that Advantageous disputes or partially disputes, or which are not cited in the materials, the Court cites to the underlying exhibits and other materials in the record or of which the Court may take judicial notice. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

[2] Although the State Defendants do not provide any evidentiary support for this fact, it is immaterial to the Court's decision.

responsible for the criminal history screening of Medicaid providers' employees.  UMF 13.

DDSD was not responsible for conducting this screening.  *Id.*

The Medicaid Fraud Division is a division within the New Mexico Attorney General's Office charged with reviewing and prosecuting referrals of potential claims of Medicaid fraud. UMF 14.  During the relevant time period, defendant Gary King was the New Mexico Attorney General, and defendant Amy Landau was an attorney in his office.  Doc. 1-1 ¶¶ 6, 7; Doc. 77 ¶¶ 6, 7.  Defendant Elizabeth Staley also was an attorney at the Attorney General's Office and was Director of the Medicaid Fraud and Elder Abuse Division there.  Doc. 1-1 ¶ 8; Doc. 77 ¶ 8. Defendant Marc Workman was an investigator for the Attorney General's Office.  Doc. 1-1 ¶ 9; Doc. 77 ¶ 9.  Defendants Orlando Sanchez and Walter Rodas both were employees of DOH. Doc. 1-1 ¶¶ 11, 12; Doc. 77 ¶¶ 11, 12.

On January 10, 2006, after completing a review of suspected fraudulent behavior, MAD referred "the issue" to the Medicaid Fraud Division, which opened an investigation into Advantageous' billing practices.  UMF 1.  On June 4, 2007, after approximately 15 months of investigation, the Medicaid Fraud Unit ("MFU") of the New Mexico Attorney General's Office demanded repayment to the State of payments made to Advantageous for services provided by six Advantageous employees whom the MFU believed did not have required background clearances.  UMF 3; *see also* Doc. 95-1 (Hughes depo at 45:2-51:7; explaining the MFU's claim for repayment); Doc. 95-2 (attachment showing MFU's claim).  Advantageous did not respond to MFU's demand.  UMF 3.  DOH placed a moratorium on business with Advantageous.  UMF 4; Doc. 98 at 2 ("Advantageous does not dispute that the Department of Health placed a moratorium on business with Advantageous," but it does dispute the reason for doing so.).

More than three years after MAD made the referral to the Attorney General's Medicaid Fraud Division, on September 28, 2009, the State of New Mexico filed suit against Advantageous for Recovery of Medicaid Overpayments, Civil Penalties, and Breach of Contract (hereafter sometimes referred to as the "underlying complaint"). UMF 6. The underlying complaint alleged that Advantageous "submitted false, fraudulent, excessive, or incomplete billings to the State's Medicaid program" by submitting claims for services provided by individuals for whom Advantageous had not obtained criminal history screenings. Doc. 95-2 at 2, ¶ 8. The underlying complaint alleged that billing for services provided by such individuals entitled the State to recover all amounts paid for those services as well as civil penalties. *See id.* at 2−3, ¶¶ 10−12. The underlying complaint also alleged that billing for services performed by individuals who "had not undergone a background check as required by state law" was a breach of Advantageous' contract with the State, and the State sought damages for that breach. *Id.* at 3−4, ¶¶ 13−15.

On September 16, 2011, nearly two years after the State filed its lawsuit against Advantageous, Judge Shannon Bacon dismissed a similar lawsuit, *State of New Mexico v. Behavioral Home Care, Inc.*, D-202-CV-201008273, for failure to state a claim. *See* UMF 7 (mistakenly stating that the case was dismissed on September 30, 2011); *see also* Doc. 98-6 at 3 (docket entry showing dismissal on September 16, 2011). The New Mexico Court of Appeals affirmed the dismissal on June 9, 2014 in a published opinion. UMF 7; *see also State ex rel. King v. Behavioral Home Care, Inc.*, 2015-NMCA-035, 346 P.3d 377 (N.M. Ct. App. Jun. 9, 2014), *cert. granted*, 2014-NMCERT-008, 334 P.3d 425 (Aug. 15, 2014), *cert. dismissed*, 2015-NMCERT-004, 348 P.3d 695 (Apr. 3, 2015).

Meanwhile, on October 28, 2011, about six weeks after Judge Bacon dismissed the suit against Behavioral Home Care, Judge Valerie Huling dismissed the state's case against Advantageous as a sanction for the Attorney General's Office's use of "document know to be false" in conjunction with a deposition. Doc. 98-1 (Judge Huling's opinion).[3] Judge Huling stated in her order that "[d]ismissal of the Complaint is warranted as a sanction considering the egregious nature of the actions of the State's investigator." Doc. 98-1 at 5. Judge Huling also stated, "Summary Judgment is granted," but she did not analyze the merits of the State's case under the summary judgment standard. *See id.*; *see also Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶¶ 7−11, 148 N.M. 713, 720−22, 242 P.3d 280, 287−89 (reviewing stringent summary judgment standard in New Mexico). On April 28, 2014, the New Mexico Court of Appeals affirmed Judge Huling's imposition of the sanction of dismissal with prejudice for the State's severe misconduct in using false documents to prosecute its case. *State ex rel. King v. Advantageous Community Services, LLC*, 2014-NMCA-076, 329 P.3d 738 (2014). The Court of Appeals did not address the State's argument that Judge Huling erred in granting summary judgment. *Id.*, 2014-NMCA-076, ¶ 11, 329 P.3d at 741.

## II.  Discussion

### A.  Legal Standard for Summary Judgment

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[3] The copy of the opinion attached to Advantageous' response is unsigned. *See* Doc. 98-1. A signed copy of the opinion is attached to this order. *See* Attachment 1.

248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant bears the initial burden of establishing that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "[T]he movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). If this burden is met, the non-movant must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Celotex*, 477 U.S. at 324. The non-moving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Rather, the non-movant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (alteration in original) (internal quotation marks omitted).

At the summary judgment stage, the Court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* Summary judgment may be granted where "the

evidence is merely colorable, or is not significantly probative." *Id.* at 249–50 (internal citations omitted).

### B. Section 1983 Claims and Qualified Immunity Generally

Section 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To establish a claim under § 1983, a plaintiff must allege that a defendant acted under color of state law to deprive the plaintiff of a right, privilege, or immunity secured by the Constitution or the laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988). The plaintiff also must identify an "affirmative link" between the alleged constitutional violation and each individual defendant. *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009).

Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would be aware. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Under the Tenth Circuit's two-part test for evaluating qualified immunity, the plaintiff must show (1) that the defendant's conduct violated a constitutional or statutory right, and (2) that the law governing the conduct was clearly established when the alleged violation occurred. *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998); *accord Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Unless both prongs are satisfied, the defendant will not be required to "engage

in expensive and time consuming preparation to defend the suit on its merits." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

The Court is not required to address the two prongs of the test in order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The Supreme Court's decision in *Pearson* permits courts to grant qualified immunity without first deciding whether a constitutional violation occurred so long as the right claimed to be violated was not clearly established. *Id.* The right that is alleged to have been violated must be "clearly established" not just as a general proposition (for example, in the way the right to free speech is clearly established), but "in a more particularized . . . sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson*, 483 U.S. at 640. Stating the right too broadly would destroy the balance that the Supreme Court has sought to establish "between the interests in vindication of citizens' constitutional rights and . . . public officials' effective performance of their duties by making it impossible for officials reasonably to anticipate when their conduct may give rise to liability for damages." *Id.* at 639 (quotation and citation omitted).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008) (internal quotations omitted). "The plaintiff is not required to show, however, that the very act in question previously was held unlawful . . . to establish an absence of qualified immunity." *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) (internal quotations omitted). The degree of specificity required depends on the egregiousness of the challenged conduct; "[t]he more obviously egregious the conduct in light of prevailing

constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Qualified immunity therefore protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

### B. The State Defendants' Motion for Summary Judgment

The only remaining claim in this case—Count I of the complaint, brought under 42 U.S.C. § 1983—alleges that the State Defendants violated Advantageous' Fourth Amendment rights by maliciously prosecuting it and misusing judicial proceedings. Doc. 1-1 ¶¶ 46–60. This claim is based on Advantageous' allegation that the State Defendants[4] lacked probable cause to initiate and continue to pursue the State's lawsuit against it, and that the State Defendants fabricated evidence to support their prosecution. *See id.* Count I further alleges that the State Defendants used extra-judicial forfeiture proceedings against Advantageous to withhold and recoup funds owed to Advantageous for Medicaid services it had provided. *Id.* ¶ 59.

The State Defendants argue that Advantageous' malicious prosecution claim must fail for a variety of reasons. They argue that no defendant violated a clearly established right and that all the defendants' actions were objectively reasonable; therefore all the State Defendants are entitled to qualified immunity. Doc. 95 at 6−13. The State Defendants also argue that the State's underlying lawsuit against Advantageous was not dismissed on the merits, but instead was dismissed as a sanction for using false documents; therefore, Advantageous cannot prove

---

[4] The parties don't differentiate among the different defendants in arguing this motion, and the Court agrees that the analysis is the same for all the State Defendants.

that the action terminated in its favor. *See id.* at 10−12. The State Defendants further argue that the fabrication of evidence neither caused harm to Advantageous, nor did it result in the seizure of any of Advantageous' funds. *See id.* at 12−13.

In response, Advantageous correctly states that the Court already found that it had adequately stated a claim for malicious prosecution based on its allegation that the State Defendants "fabricated evidence, prosecuted Advantageous based on the fabricated evidence and without probable cause, and that the prosecution resulted in a seizure of money belonging to Advantageous." Doc. 98 at 8. At the summary judgment stage, however, Advantageous must come forward with sufficient evidence to support its claims. *Johnson*, 422 F.3d at 1187 (non-movant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment"). Advantageous argues that the State Defendants are not entitled to qualified immunity because the State Defendants initiated the underlying lawsuit without probable cause and based on fabricated evidence, and that the State Defendants seized funds belonging to Advantageous based on the meritless lawsuit. *See* Doc. 98 at 8−15. Advantageous further argues that the rights the State Defendants violated were clearly established. *Id.* at 15−18. Lastly, Advantageous argues that the State Defendants' motion is premature because it needs additional time to conduct additional discovery. *Id.* at 18−20. For the following reasons, the Court will grant the State Defendants' motion.

1. <u>Qualified Immunity</u>

To support its claim for malicious prosecution under § 1983, Advantageous must present sufficient evidence to support the following elements: (1) the State Defendants caused

Advantageous' continued prosecution[5]; (2) the original action terminated in favor of Advantageous; (3) no probable cause supported the original or continued prosecution of Advantageous; (4) the State Defendants acted with malice; and (5) Advantageous sustained damages. *See Sanchez v. Hartley*, 810 F.3d 750, 754 n.1 (10th Cir. 2016) (citing *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008)). Advantageous also must show, of course, that it suffered a constitutional violation. *See Pierce*, 359 F.3d at 1289 ("Although the common law tort [of malicious prosecution] serves as an important guidepost for defining the constitutional cause of action, the ultimate question is always whether the plaintiff has [suffered] a constitutional violation."). Advantageous' theory in this case has always been that the State Defendants unreasonably seized property belonging to Advantageous in violation of the Fourth Amendment. *See* Doc. 98 at 8 ("Defendants are not entitled to qualified immunity because they violated a clearly established right when they prosecuted Advantageous based on fabricated evidence and that prosecution led to a wrongful seizure of Advantageous' property.").

The State Defendants' first argument that they are entitled to qualified immunity is their claim that "unless the plaintiff is 'arrested, incarcerated, or otherwise placed under the direct physical control of the state,' there cannot be a malicious prosecution claim under the Fourth Amendment." Doc. 95 at 8. The Court already has rejected this argument in its order denying the State Defendants' motion to dismiss. *See* Doc. 142 at 11−13. Advantageous' claim is based on a seizure of property—not the seizure of a person—which the Supreme Court has held can

_____

[5] As was made clear in my prior order denying the State Defendants' motion to dismiss, Advantageous is not proceeding on a theory that it was physically seized in violation of the Fourth Amendment. *See* Doc. 142 at 11−13. The Court therefore has eliminated references to "confinement" and "arrest" from the elements of a malicious prosecution claim as they are not pertinent to this case.

support a Fourth Amendment malicious prosecution claim under § 1983.  *See Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992).

The State Defendants' second argument for qualified immunity has merit.  They argue that when the Attorney General's office filed its lawsuit against Advantageous in 2009 for Medicaid fraud, they did not know that the State's claim was invalid and not legally supportable.  *See* Doc. 95 at 8−9; *see also* Doc. 95-2 (underlying complaint against Advantageous filed on September 28, 2009).  In other words, on September 28, 2009, the day the State filed its lawsuit against Advantageous, the State Defendants reasonably believed they had "probable cause" to file the lawsuit because the state of the law in New Mexico at that time did not clearly establish that the case was without merit.  Indeed, the State Defendants had no reason to know that their lawsuit was legally unsupportable until the New Mexico Court of Appeals affirmed Judge Bacon's decision on June 9, 2014, which was six weeks *after* the New Mexico Court of Appeals affirmed Judge Huling's dismissal of the lawsuit against Advantageous.  *Compare State ex rel. King v. Behavioral Home Care, Inc.*, 2015-NMCA-035, 346 P.3d 377 (Jun. 9, 2014) *with State ex rel. King v. Advantageous Community Services, LLC*, 2014-NMCA-076, 329 P.3d 738 (Apr. 28, 2014).  Thus, because the lack of probable cause for the State's lawsuit was not clearly established until after the lawsuit against Advantageous was dismissed, the State Defendants are entitled to qualified immunity for initiating and continuing the lawsuit.

In *Behavioral Home Care, Inc.*, the court examined whether Behavioral Home Care's ("BHC") billing for services by certain caregivers for whom BHC had not fully complied with the Caregivers Criminal History Screening Act ("CCHSA"), N.M. STAT. ANN. 1978, §§ 19-17-2 to 29-17-5 (1998, as amended through 2005), constituted false, fraudulent, or excess payments under the Medicaid Fraud Act.  *Behavioral Home Care, Inc.*, 2015-NMCA-035, ¶¶ 1−2, 346

P.3d at 380.  According to the complaint against BHC, and similar to the allegations against

Advantageous, BHC electronically submitted over 1800 billing claims for services provided by

certain caregivers whose criminal history screening applications had not been submitted as

required by the CCHSA.  *Id.* ¶ 8, 346 P.3d at 381.  The State asserted that BHC's claims for

payment for these unscreened caregivers constituted falsification of documents or Medicaid

fraud under the Medicaid Fraud Act (MFA).  *Id.* ¶ 9, 346 P.3d at 382.  The State also asserted

that submitting these claims constituted a breach of BHC's contract with the State.  *See id.*  The

New Mexico Court of Appeals described the legal issue raised by the State's allegations as

"whether BHC's failure as a Medicaid provider to comply with certain DDHSA screening

application requirements constitutes billing and payment fraud under the MFA and exposes BHC

to liability under the MFA."  *Id.* ¶ 13, 346 P.3d at 383.  The court characterized this issue "as a

matter of first impression in New Mexico."  *Id.*

     The New Mexico Court of Appeals held that BHC's "failure to comply with the CCHSA

regulations does not support MFA liability," and it affirmed Judge Bacon's dismissal of the

State's lawsuit.  *Id.* ¶ 3, 346 P.3d at 380.  In doing so, the court compared the State's claims to

claims of Medicare fraud brought under the False Claims Act ("FCA"), which distinguishes

between "'conditions of participation' in the Medicare program (which do not support an FCA

claim)" and "'conditions of payment' from Medicare funds (which do support FCA claims)."  *Id.*

¶ 20, 346 P.3d at 384−85.  After analyzing the MFA statutory scheme and how it treats

violations of the CCHSA, the court held that BHC's practice of failing to comply with the

CCHSA's screening procedures was not in violation of the conditions for payment from

Medicaid funds and therefore did not support a claim of Medicaid fraud.  *Id.* ¶ 30, 346 P.3d at

388.  The court also held that BHC's conduct did not constitute a breach of its contract with the state.  *Id.* ¶ 34, 346 P.3d at 389.

As noted above, the New Mexico Court of Appeals itself identified the State's theory of liability "as a matter of first impression in New Mexico" on June 9, 2014, and also noted that the issue was "novel."  *Id.* ¶¶ 13, 16, 346 P.3d at 383, 384.  Thus, there is no question that the law was not clearly established on September 28, 2009, the day the State filed its lawsuit against Advantageous, or even on April 28, 2014, when the New Mexico Court of Appeals affirmed the dismissal of the State's suit against Advantageous as a sanction for creating false documents.  Although Judge Bacon dismissed the State's case against BHC for failure to state a claim about six weeks before Judge Huling dismissed the State's case against Advantageous, Judge Bacon's decision was not binding on Judge Huling.  *State ex rel. Children, Youth and Families Dept. v. Djamila B*., 2014-NMCA-045, ¶ 14, 322 P.3d 444, 448 ("One district court judge cannot set aside the order of another district court judge.") (citing N.M. CONST. art. VI, § 13).  Because the law was unsettled until the New Mexico Court of Appeals issued its decision in *Behavioral Home Care* in June 2014, the State Defendants had no reason to know that their case against Advantageous was legally unsound not only when they filed it, but also when its dismissal was affirmed by the New Mexico Court of Appeals.  The State Defendants are entitled to qualified immunity for filing the State's case against Advantageous for Medicaid fraud, and for continuing to prosecute the case until its dismissal was affirmed by the New Mexico Court of Appeals in April 2014.

### 2.  The Fabricated Evidence

Advantageous argues that the State Defendants "are not entitled to qualified immunity because they violated a clearly established right when they prosecuted Advantageous based on

fabricated evidence and that prosecution led to a wrongful seizure of Advantageous' property."

Doc. 98 at 8. Advantageous further argues that "liability attaches even where the lack of

probable cause was not known at the outset of litigation." *Id.* at 9 (citing *Pierce v. Gilchrist*, 359

F.3d 1279, 1291−92, 1297 (10th Cir. 2004)). The undisputed evidence, however, does not

support Advantageous' claim.

To support its claim that the State Defendants fabricated evidence, Advantageous relies

on the findings made by Judge Huling when she dismissed the State's case against

Advantageous as a sanction for using a false document in a deposition taken during the course of

the underlying litigation as well as the affirmance of that dismissal by the New Mexico Court of

Appeals. *See* Doc. 98 at 9−12. But those court rulings establish that the State Defendants did

not create the false document until well after the State initiated its case against Advantageous,

and that relatively soon after the false document was created and discovered, Judge Huling

dismissed the lawsuit. Furthermore, there is no evidence that the creation of the false document

led to the continuation of the lawsuit or the seizure of any of Advantageous' property.

Although Advantageous relies primarily on the district court's findings, the New Mexico

Court of Appeals' recitation of the facts is more complete. Because the facts relating to the

fabrication of evidence are crucial to the resolution of this lawsuit, I have reproduced the New

Mexico Court of Appeals' statement of those facts in its entirety.[6] In understanding those facts,

---

[6] [F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *St. Louis Baptist Temple, Inc. v. Federal Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979). Furthermore, because both the State Defendants and Advantageous had a full and fair opportunity to litigate the fabrication of evidence issue in the state case, both parties would be collaterally estopped from challenging the New Mexico state courts' findings in this case. *See Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1520 (10th Cir. 1990) ("Under collateral

it is important to know that Advantageous Community Services, LLC was doing business as Imagine, LLC, and the Court of Appeals referred to Advantageous as "Imagine" throughout its opinion. *See Advantageous Community Services, LLC*, 2014-NMCA-076, ¶ 1, 329 P.3d at 739.

Imagine contracts with individual caregivers to provide home-based healthcare services to Medicaid recipients through the Medicaid Developmental Disabilities Waiver Program. New Mexico Department of Health (DOH) regulations require home-based healthcare providers like Imagine to submit criminal history screening applications to DOH for each of its caregivers. Once the criminal application is submitted, DOH then conducts a state and nationwide criminal background check. Upon completion of the background check, DOH sends a "clearance letter" stating whether a caregiver has any reported disqualifying convictions. In its suit the State alleges that Imagine knowingly submitted bills for services provided by six caregivers whose criminal histories did not meet the screening requirements and that, therefore, Imagine violated [ ] the Medicaid Fraud Act, NMSA 1978, §§ 30-44-1 to -8 (1989, as amended through 2004). According to the State, the Medicaid payments Imagine received from the State and paid to the six caregivers constituted overpayments, which the State had a right to recoup as damages, in addition to civil penalties.

The State compared the date on the clearance letter for each of the six caregivers to the date each caregiver was hired to support its claims that caregivers were providing services that were billed to Medicaid before DOH confirmed that they had a clear criminal history. Thus, the clearance letter issued for each caregiver is critical to the State's theory of liability. On the other hand, Imagine contends that DOH regulations permit caregivers to work under conditional supervised employment while DOH conducts the screening and that the regulations only require that criminal history screening applications be submitted for each caregiver within the first twenty days of employment. Therefore, according to Imagine, the dates Imagine submitted the criminal history screening applications and/or whether applications were submitted at all would have been relevant to whether any violations occurred, not the date on the clearance letters marking completion of the screening process.

---

estoppel, 'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'") (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)); *Shovelin v. Central New Mexico Elec. Co-op.*, Inc., 1993-NMSC-015, ¶ 10, 114 N.M. 293, 297, 850 P.2d 996, 1000 ("The doctrine of collateral estoppel fosters judicial economy by preventing the relitigation of ultimate facts or issues actually and necessarily decided in a prior suit.") (internal quotation marks omitted).

The Assistant Attorney General (the AAG)[7] prosecuting the case asked an investigator for the Attorney General's Office (the investigator)[8] working in the [M]edicaid fraud unit to prepare packets of documents relating to each of the six caregivers to be used at the deposition of Dr. Arminder Kaur, the owner and corporate representative of Imagine. She specifically asked the investigator to include a copy of the clearance letter from DOH for each caregiver to be included in the packet. However, the investigator was unable to locate copies of the actual clearance letters Imagine had previously produced for two of the caregivers, so he called Walter Rodas at DOH to see if DOH had copies. Mr. Rodas told the investigator that DOH did not keep hard copies of the letters on file, so the investigator asked Mr. Rodas to "reprint" copies of the 2006 clearance letters from its electronic data base.

Mr. Rodas told the investigator that it would not be possible to reprint accurate copies of the letters because the computer system had updated several fields in the clearance letter template. The investigator nevertheless told Mr. Rodas to go ahead and print the letters with the updated data. Mr. Rodas faxed the letters to the investigator with a cover sheet stating,

> Per your request, attached find copies of the clearance letters for [the two caregivers]. These letter[s] were issued for Imagine back in 2006. In addition to the discrepancies I mentioned to you already over the phone, our letter template pulls information current on our system. That is why the letters are issued and addressed to Melissa McCue, but she may have not been the contact person at Imagine back then. Also, the letters are signed by Gil Mendoza, but he was not the manager of this department in 2006; nor was Ms. Martinez the governor at that time either. Unfortunately, we do not have access to the original letters any longer and this is the best I can do to assist you from our computer records.

The investigator put the false letter in the packet for each caregiver and delivered the packets to the AAG. However, he left the fax cover sheet explaining that the letters were not authentic copies on his desk, and he did not tell the AAG that he had been unable to locate copies of the actual clearance letters that were sent to Imagine.

One of the created letters is attached to this Opinion as Appendix 1, and a copy of the actual clearance letter sent to Imagine in 2006 for the same employee is attached to this Opinion as Appendix 2. Though the dates of the two letters are

---

[7] According to Judge Huling's opinion, the responsible AAG was State Defendant Amy Landau. Doc. 98-1 at 3, ¶ 10.

[8] According to Judge Huling's opinion, the investigator was State Defendant Mark Workman. Doc. 98-1 at 3−4, ¶¶ 9−14, 16−20.

the same, and the "Control No." for the employee match, the letters are obviously otherwise very different.

At Dr. Kaur's deposition[9] she testified that, as far as she knew, Imagine was in compliance with the criminal history screening requirements at the time of the alleged violations. Her former business partner's son, Karan Sangha, and former employee, Diane Nunn, were in charge of ensuring compliance with the criminal history screening requirements, and they had assured her that Imagine was at all times in compliance. Dr. Kaur added that Karan Sangha and Diane Nunn later left to form their own home healthcare business, taking with them the documentary evidence of Imagine's compliance. After they left, Melissa McCue, another employee at Imagine, took over the caregiver criminal history compliance duties. When presented with Exhibit 15 (Appendix 1) and asked why it was addressed to Melissa McCue in October of 2006, Dr. Kaur's reaction was surprise. A clearance letter sent to Imagine in 2006 should have been addressed to Karan Sangha, and Exhibit 15 also had Imagine's new office address rather than the address it had in 2006.

Imagine filed a motion for sanctions against the State for using a fabricated document at the deposition, as well as a motion for summary judgment on the merits.[10] The district court held an evidentiary hearing to address the motion for sanctions at which the foregoing facts were developed. The AAG also answered questions posed by the district court, denying that she knew the letter was false when she utilized it in the deposition and admitting she did not observe the discrepancy of the incorrect governor on the letterhead.

The district court then filed detailed findings of fact and conclusions of law. In pertinent part, the district court made findings of fact that Exhibit 15 is a purported letter from DOH to Imagine, care of Melissa McCue, but it is a false document, and was created by the State for this litigation. Specifically, the text of the letter, the addressee, and the signature line are inaccurate. Further, the district court found, while the investigator was told that Exhibit 15 is not a true and correct copy of the original document, the investigator did not disclose that information to the AAG, and the AAG failed to observe the obvious discrepancy in the document that Susana Martinez was not the Governor in 2006, which would have alerted her that it could not be an accurate copy of a 2006 document. The district court added that the investigator knew the document was false and that it was going to be used at Dr. Kaur's deposition, but he did not disclose his knowledge to the AAG, who then attempted to impeach Dr. Kaur with the document. Importantly, the district court also found that, "[c]onsidering his position as an investigator for the Attorney General's Office, [the investigator]'s testimony that he did not believe the information was important is not credible."

---

[9] Dr. Kaur's deposition took place on March 9, 2011, a little more than 17 months after the State filed its lawsuit against Advantageous in 2009. *See* Doc. 98-1 at 2, ¶ 3.

[10] Advantageous, a/k/a Imagine, filed its motion for sanctions on March 29, 2011, and its motion for summary judgment on June 1, 2011. *See* Attachment 2 (Docket sheet *for State ex rel. King v. Advantageous Community Services, LLC*, Case No. D-202-CV-2009-11396).

All of the investigator's actions were done in the course and scope of his employment with the Attorney General's Office of the State of New Mexico. Moreover, the district court found, "[c]onsidering the immense power of the Attorney General's Office, the public must be able to rely on the truth of documents produced in litigation by the Attorney General's office, its attorneys and investigators" and that "[a]n investigator allowing an assistant attorney general to utilize a document known to be false in discovery is an egregious offense subject to sanctions."

The district court accordingly concluded as a matter of law that "[d]ismissal of the Complaint is warranted as a sanction considering the egregious nature of the actions of the State's investigator." The district court also concluded that Imagine's motion for summary judgment should be granted. A formal order was entered dismissing the case with prejudice, and the State appeals. Because we affirm dismissal of the case as a sanction, we do not discuss the State's argument that the court erred in granting summary judgment.

*Advantageous Community Services, LLC*, 2014-NMCA-076, ¶¶ 2−11, 329 P.3d at 739−41.

These facts make plain that the State Defendants did not fabricate any evidence to support the *initiation* of the State's lawsuit against Advantageous. The underlying complaint was filed approximately 17 months before Mr. Workman asked DOH to "reprint" the two clearance letters he received from DOH shortly before Dr. Kaur's deposition on March 9, 2011. These facts further make clear that the fabricated evidence did not serve to perpetuate the lawsuit, nor do they show that the State Defendants used the fabricated evidence to seize Advantageous' property.

As the New Mexico Court of Appeals made clear, the fabricated evidence led to the *dismissal* of the case against Advantageous, not its continuation. Further, the fabricated evidence did not show that the State lacked probable cause to continue its case against Advantageous. As the court explained, the two fabricated clearance letters were important to the State's case because the State contended that a particular caregiver-employee could not provide Medicaid services under Advantageous' contract with the State until that caregiver was screened for criminal convictions and cleared. *See Advantageous Community Services, LLC*, 2014-NMCA-

076, ¶ 3, 329 P.3d at 740.  Thus, the important aspects of the letters from the State's perspective

was the date of the letter, and that the particular caregiver was cleared.  *See id.*  On these points,

the State's "reprinted" letter was consistent with the true letter.  *Compare id.*, Appendix 1

("reprinted" letter) *with id.*, Appendix 2 (true letter); *see also id.*, 2014-NMCA-076, ¶ 33, 329

P.3d at 746 (Bustamante, J., concurring) ("The State maintained that caregivers could not be paid

until they had cleared their criminal background screening.  Imagine asserted that caregivers

could be hired and paid pending completion of the screening process.  Thus, for the State's

purpose, the most salient information on the falsely reproduced letters was the identity of the

caregiver and the date the approved screening issued.  There is no issue that these 'critical

fields'—as the State terms them—were accurate.").  Thus, the two fabricated letters did not

create probable cause where none existed.

Importantly, this case bears little resemblance to *Pierce*, 359 F.3d at 1291−92, 1295−96

on which Advantageous relies for the proposition that "liability for malicious prosecutions

extends to those who continue prosecutions when they obtain knowledge that there is no

probable cause to proceed against the defendant."  Doc. 98 at 13 (internal quotation marks

omitted).  In *Pierce*, the plaintiff spent 15 years in an Oklahoma state prison for a rape he did not

commit.  359 F.3d at 1281.  The plaintiff finally was exonerated and released as a result of a

DNA analysis.  *Id.*  He later brought a § 1983 malicious prosecution case against, among others,

a forensic chemist for the Oklahoma City Police Department who fabricated inculpatory

evidence against the plaintiff and disregarded exculpatory evidence, which led prosecutors to

indict, prosecute and ultimately convict the plaintiff for the rape.  *Id.*  The forensic chemist

sought to have the malicious prosecution case against her dismissed on the ground that she was

not involved in the *initiation* of the prosecution against the plaintiff, but only became involved

later, after the plaintiff was arrested and charged.  *See id.* at 1291.  The Tenth Circuit rejected

this claim, holding that "when the fabrication of evidence results in a constitutional deprivation,

the official's responsibility for that deprivation does not hinge on the exact stage of investigatory

or prosecutorial process at which the fabrication occurred."  *Id.* at 1296.

In other words, the fabrication of evidence in *Pierce* resulted in the continued prosecution

and conviction of an innocent man, who then spent 15 years in jail for a crime he did not

commit.  In contrast, the fabrication of evidence in this case resulted in the dismissal of the

lawsuit against Advantageous, and there is no evidence that it resulted in any seizure of

Advantageous' funds.  The only evidence of any "seizure" of Advantageous' funds are three

exhibits attached to Advantageous' response which show denials of some payments to

Advantageous for various reasons between July 23, 2007 and September 30, 2011.  *See* Docs.

98-2, 98-3, 98-4.  Only the September 30, 2011, denials post-date the State's initiation of its

lawsuit against Advantageous and the creation of the fabricated evidence.  *See* Doc. 98-4.  Thus,

the earlier denials of payment cannot have resulted from either the initiation of the lawsuit

against Advantageous or the fabricated evidence.  Further, for each denial of payment that post-

dates the initiation of the lawsuit and the fabrication of evidence, there is an explanatory "EOB"

code associated with the denial, which states the reason why each claim was denied.  *See id.*  The

explanations range from requiring Advantageous to "[v]erify the modifier on the claim matches

the modifier authorized," to stating that "[p]rior authorization has been used or the units/amount

billed are greater that the units/amount remaining on the authorization."  Doc. 98-4 at 17.  There

is no evidence that links these denials to the fabricated evidence.

Perhaps more important, however, is that Advantageous has not cited, and the Court has

not found, any case that holds that the wrongful denial of payment for services rendered

constitutes a seizure of property under the Fourth Amendment. The Fourth Amendment, made

applicable to the States by the Fourteenth Amendment, *Ker v. California*, 374 U.S. 23, 30

(1963), provides in pertinent part that the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated . . . ." U.S. CONST. amend. IV. As the Supreme Court has explained, "[a] 'seizure' of

property occurs when there is some meaningful interference with an individual's possessory

interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Thus, the

Supreme Court has held that the forcible removal of a couple's trailer home from its lot was a

"seizure" within the meaning of the Fourth Amendment. *See Soldal*, 506 U.S. at 72. The Tenth

Circuit has held that the killing of a pet dog was a seizure of property within the meaning of the

Fourth Amendment because "[k]illing a dog meaningfully and permanently interferes with the

owner's possessory interest." *Mayfield v. Bethards*, 826 F.3d 1252, 1256 (10th Cir. 2016).

Similarly, an undersheriff's assistance in removing a person's property from her farm was a

seizure within the meaning of the Fourth Amendment, *Price-Cornelison v. Brooks*, 524 F.3d

1103, 1115−19 (10th Cir. 2008), as was the removal of 70 derelict vehicles from a person's

property, *Lawrence v. Reed*, 406 F.3d 1224, 1227, 1235−36 (10th Cir. 2005). City ordinances

that regulated the sale and display of art on city-owned property did not, however, violate the

Fourth Amendment as there was no seizure of either the artist or his artwork. *Travis v. Park City

Mun. Corp.*, 565 F.3d 1252, 1257 (10th Cir. 2009).

      Unlike the cases in which the Supreme Court and the Tenth Circuit have found seizures

of property, there is no evidence in this case that the State Defendants seized funds that were

already in Advantageous' possession. Even if the State Defendants wrongfully denied payment

to Advantageous, they did not interfere with Advantageous' possessory interest in these

payments because Advantageous was not yet in possession of the funds. There is no evidence that the State Defendants seized any of Advantageous' bank accounts or otherwise took control of money that already was in Advantageous' possession.[11] And there is no Tenth Circuit or Supreme Court case that holds that the wrongful denial of a payment constitutes a seizure of property under the Fourth Amendment. Thus, even if the wrongful denial of payments constituted a seizure under the Fourth Amendment, it was not a right that was clearly established on or before September 30, 2011. *See Fogarty*, 523 F.3d at 1161 ("for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point . . . .").

### 3. The State Defendants' Motion is Not Premature[12]

Advantageous argued at the end of April that it was "entitled to additional time and opportunity to take discovery" because the State Defendants had systematically obstructed

---

[11] Advantageous attached a barely legible exhibit to its Rule 56(d) Supplement to Response, filed on November 11, 2019. *See* Doc. 161-1 at 33 (Exhibit 5). Exhibit 5 is a remittance advice summary prepared by the Human Services Department dated July 25, 2011 (?—date is somewhat unclear) showing net claimed transactions of $104,099.57, payouts of $65,000, receivable recoupments of $65,000, and a remittance cycle total of $39,099.57. Doc. 161-1 at 33. It shows that a check was issued for $65,000, and an "EFT" (electronic funds transfer?—last two letter are illegible) was issued for $39,099.57. *Id.* Advantageous does not explain exactly what this document shows. It states only that "HSD withheld money due to Advantageous after Landau asked Apodaca and another HSD employee why Advantageous was still being paid," and cites Exhibit 5 as an example of this. Doc. 161 at 3. But again, even if this is true, the Court has found no Tenth Circuit or Supreme Court case that holds that the wrongful withholding of money owed constitutes a "seizure" under the Fourth Amendment. Advantageous also asserts that "[l]ess that two weeks after Ms. Landau's requests, Defendant Cathy Stevenson informed Advantageous that its provider agreement was being terminated." *Id.* The Court already has held, however, that Advantageous did not have a protected property interest in its continued status as a Medicaid provider, and that the State's termination of its contract could not form the basis of its malicious prosecution claim. Doc. 31 at 12.

[12] Rule 56(b) provides that "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." FED. R. CIV. P. 56(b). The Court set a deadline of April 24, 2019 for the filing of pretrial motions. *See* Doc. 68 at 1. The State Defendants filed their motion on April 12, 2019, twelve days before the deadline.

Advantageous' discovery efforts.  *See* Doc. 98 at 18−20.  But Advantageous made no effort to outline what additional discovery it needed in order to adequately respond to the State Defendants' motion.  *See id.*  On November 11, 2019, Advantageous filed a supplement to the response it had filed in April which included additional information which generally showed that HSD—the State entity responsible for paying Advantageous for the Medicaid services it rendered—may have coordinated with the Attorney General's MFU in deciding whether to pay Advantageous and ultimately to end its contract with the State.  However, as outlined above, even if the State Defendants wrongfully withheld payments to Advantageous, this does not amount to a clearly established constitutional violation.  And the Court already has held that Advantageous did not have a protected property interest in its continued status as a Medicaid provider; therefore the State's termination of its provider contract cannot form the basis of its malicious prosecution claim whether or not the MFU was involved in terminating that contract. *See* Doc. 31 at 12.  In short, the additional materials do not create a disputed issue of material fact that warrants a denial of summary judgment.

More importantly, Rule 56(d) provides that "[i]f a nonmovant shows *by affidavit or declaration* that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may:  (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  FED. R. CIV. P. 56(d) (emphasis added).  Advantageous did not submit any affidavit or declaration in conjunction with its response that specifically explained why it could not adequately respond to the State Defendants' motion without further discovery, nor did it make any effort to comply with the Tenth Circuit's requirements for obtaining additional discovery under Rule 56(d).  *See generally* Doc. 98; *see also Gutierrez v. Cobos*, 841 F.3d 895,

908 (10th Cir. 2016) (outlining requirements for obtaining additional discovery under Rule 56(d)). The State Defendants' motion for summary judgment is not premature, and Advantageous is not entitled to additional discovery under Rule 56(d).

### III.    <u>Conclusion</u>

For the foregoing reasons, the Court GRANTS the State Defendants' Motion for Summary Judgment (Doc. 95).

**IT IS SO ORDERED.**

Laura Fashing
United States Magistrate Judge
Presiding by Consent